UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HEIDI L.,[1]

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

Case No. 4:23-cv-10366
District Judge Shalina D. Kumar
Magistrate Judge Kimberly G. Altman

_____/

## REPORT AND RECOMMENDATION ON
## CROSS MOTIONS FOR SUMMARY JUDGMENT

I.      Introduction

This is a social security case.  Plaintiff Heidi L. brings this action under 42

U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of

Social Security (Commissioner) denying her application for Disability Insurance

Benefits (DIB) under the Social Security Act (the Act).  Both parties have filed

summary judgment motions, (ECF Nos. 12, 14), which have been referred to the

undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B),

---

[1] Consistent with guidance regarding privacy concerns in Social Security cases by
the Judicial Conference Committee on Court Administration and Case
Management, this district has adopted a policy to identify plaintiffs by only their
first names and last initials.  *See also* Fed. R. Civ. P. 5.2(c)(2)(B).

(ECF No. 11).

For the reasons set forth below, the undersigned RECOMMENDS that Plaintiff's motion, (ECF No. 12), be DENIED; the Commissioner's motion, (ECF No. 14), be GRANTED; and the decision of the administrative law judge (ALJ) be AFFIRMED.

## II.    Background

### A.    Procedural History

Plaintiff was 38 years old at the time of her amended alleged onset date of November 16, 2018.  (ECF No. 6-1, PageID.32, 122).  Plaintiff's last insured date is December 31, 2019.  (*Id.*, PageID.35).  As such, the relevant disability period is only about thirteen months long.

Plaintiff has past relevant work as a customer service representative, receptionist, and data entry clerk.  (*Id.*, PageID.45).  She alleges disability due to Chiari,[2] Ehlers-Danlos,[3] migraines, fibromyalgia, chronic pain, posttraumatic

---

[2] "A Chiari malformation is a problem in which a part of the brain (the cerebellum) at the back of the skull bulges through a normal opening in the skull where it joins the spinal canal.  This puts pressure on parts of the brain and spinal cord, and can cause mild to severe symptoms.  In most cases, the problem is present at birth (congenital)."  https://www.hopkinsmedicine.org/health/conditions-and-diseases/chiari-malformation-type-i (last visited Jan. 25, 2024).

[3] "Ehlers-Danlos syndrome is a group of inherited disorders that affect your connective tissues — primarily your skin, joints and blood vessel walls.  Connective tissue is a complex mixture of proteins and other substances that provide strength and elasticity to the underlying structures in your body."

2

stress disorder (PTSD), neuropathic pain, syringomyelia,[4] brain damage, and anxiety.  (*Id.*, PageID.123).

On December 16, 2019, Plaintiff filed an application for DIB.  (*Id.*, PageID.123).  Her application was initially denied on November 5, 2020.  (*Id.*, PageID.134).  Plaintiff timely requested an administrative hearing, which was held before the ALJ on December 15, 2021.  (*Id.*, PageID.53).  Plaintiff testified by video at the hearing, as did a vocational expert.  (*Id.*, PageID.58-92).  Plaintiff offered the following testimony.

Plaintiff was 41 years old at the time of the hearing.  (*Id.*, PageID.58).  She lived with her husband and their two children who were 14 and 9 years old.  (*Id.*, PageID.59).  She had a bachelor's degree.  (*Id.*, PageID.58).

Plaintiff did not believe she would be able to engage in any fulltime employment due to chronic pain and illness.  (*Id.*, PageID.61).  She had a Chiari malformation for which she had a decompression in 2017.  (*Id.*, PageID.61-62).  Plaintiff's low back pain was a four or five out of ten on average.  (*Id.*, PageID.62).

---

https://www.mayoclinic.org/diseases-conditions/ehlers-danlos-syndrome/symptoms-causes/syc-20362125 (last visited Jan. 25, 2024).

[4] "Syringomyelia is a condition in which a fluid-filled cyst called a syrinx forms within your spinal cord.  The syrinx can get bigger and elongate over time, resulting in damage to your spinal cord and compression and injury of the nerve fibers that carry information from your brain to the rest of your body and vice versa."  https://my.clevelandclinic.org/health/diseases/6126-syringomyelia (last visited Jan. 25, 2024).

If she "overdid it," her pain could reach an eight or nine out of ten.  (*Id.*).

During the relevant period, Plaintiff took Norco for pain and Baclofen to control her spinal spasms.  (*Id.*, PageID.63).  She also tried physical therapy but was unable to attend on a regular basis.  (*Id.*, PageID.67).  She was sometimes able to do home exercises and meditation.  (*Id.*).  In addition to spinal pain, Plaintiff experienced neuropathic pain in her arms, hands, and wrists that worsened when she washed dishes, used her phone too much, or did other activities with her hands. (*Id.*).

Plaintiff suffered from daily fibromyalgia flares and related insomnia.  (*Id.*, PageID.65).  She was unable to take any medication to treat fibromyalgia because of her body's reactions, which included ten to twelve hours of migraines and vomiting.  (*Id.*).  Plaintiff spent about "16 hours a day on [her] best days" resting in bed on her back.  (*Id.*, PageID.66).

Plaintiff was able to drive for a maximum of fifteen to twenty minutes at one time.  (*Id.*, PageID.58).  She estimated that she could walk up to thirty minutes at the grocery store on a bimonthly basis.  (*Id.*, PageID.68).  She could do light housework for thirty minutes, followed by twenty minutes of rest for a two-hour period.  (*Id.*).  Plaintiff could only sit for fifteen minutes at a time before her lower back began hurting and spasming.  (*Id.*).

Her mental health was "tied to [her] physical condition."  (*Id.*, PageID.70-

71). Plaintiff was unable to tolerate antidepressants but had taken Klonopin to help ease her anxiety and irritability. (*Id.*, PageID.70). Plaintiff avoided her family on bad days because she became irritable and felt bad when she snapped at them. (*Id.*, PageID.70).

On January 11, 2022, the ALJ issued a written decision finding that Plaintiff was not disabled. (*Id.*, PageID.29-52). On February 7, 2022, the Appeals Council denied Plaintiff's request for review, (*id.*, PageID.24-25), making the ALJ's decision the final decision of the Commissioner. Plaintiff timely filed for judicial review of the final decision. (ECF No. 1).

## B. Medical Evidence[5]

### 1. Pain Management Records

During the relevant period, from November 16, 2018 to December 31, 2019, Plaintiff regularly treated with Edmond Ducommun, M.D. (Dr. Ducommun) who is a physical medicine and rehabilitation specialist.

At her January 16, 2019 appointment with Dr. Ducommun, Plaintiff reported that she continued to experience neck pain, headaches, and neuro fatigue

---

[5] Most of the medical records either predate Plaintiff's alleged onset date of November 16, 2018, or postdate her date last insured of December 31, 2019. These records are omitted from the following summation of the medical evidence because they fall outside of the relevant period. *See, e.g.*, *Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, 716 n.8 (S.D. Ohio 2012) ("In determining whether a Plaintiff is 'disabled,' the ALJ generally only considers evidence from the alleged disability onset date through the date last insured.").

particularly after being "too active." (ECF No. 6-1, PageID.405).  While Plaintiff

reported that her medications helped, she also indicated that if she did "too much

activity" that she would have to spend a day or two in bed recovering.  (*Id.*).

On March 12, 2019, Plaintiff had an appointment with Dr. Ducommun

where she reported experiencing "difficulties with anxiety and PTSD symptoms."

(*Id.*, PageID.403).  These symptoms "drastically limit[ed] her ability to get out and

do things." (*Id.*).  The combination of her anxiety and PTSD symptoms and her

chronic pain meant there were periods where she was "effectively bedridden for up

to a couple of days." (*Id.*).  Dr. Ducommun noted that Plaintiff's fibromyalgia was

stable. (*Id.*, PageID.404).

At her April 10, 2019 appointment with Dr. Ducommun, Plaintiff reported

continuing to have allergic reactions to any pain medications containing

acetaminophen.  (*Id.*, PageID.401).  She explained that her pain was "essentially

unmanageable" without taking pain medications, but that the allergic reactions

were "almost as bad [as] the pain itself." (*Id.*).

On May 2, 2019, Plaintiff reported to Dr. Ducommun that after

discontinuing Baclofen, she felt suicidal.  (*Id.*, PageID.399).  Once she restarted

the medication, "the severe suicidal thoughts went away." (*Id.*).  Plaintiff felt like

her allergy to Baclofen had improved.  (*Id.*).  Dilaudid "really worked for her

pain." (*Id.*).  After running out of Vyvanse, Plaintiff "found that her cognition

went way down." (*Id.*).

At her June 4, 2019 appointment, Plaintiff reported to Dr. Ducommun that she thought she was now allergic to Hydromorphone. (*Id.*, PageID.397). She reported that Vyvanse "continue[d] to help significantly with her cognition." (*Id.*). On June 26, 2019, Plaintiff asked Dr. Ducommun about trying Ketamine to treat her pain. (*Id.*, PageID.395).

At her August 19, 2019 appointment, Plaintiff told Dr. Ducommun that she felt that Ketamine had "really been a benefit[,]" and that she felt like "life [was] worth living again." (*Id.*, PageID.393). She continued to struggle with memory problems, and while she felt like her " 'core pain' " had been better for a couple of weeks, she still struggled with fatigue. (*Id.*). Dr. Ducommun noted that while Plaintiff "has noticed some improvement with [ ] [K]etamine in her neuropathic pain[,] she continues to have fibromyalgia and chronic fatigue symptoms." (*Id.*, PageID.394).

On September 16, 2019, Plaintiff reported to Dr. Ducommun that Ketamine was working for her nerve pain, but she was unsure if it was "also helping with her regular pain." (ECF No. 6-1, PageID.391). She felt that Ketamine was helping her be able to do more with her kids and complete more home cleaning. (*Id.*). Plaintiff was attempting to taper off Tramadol. (*Id.*). She was down to four a day, but if she took less than that she experienced nausea and vomiting. (*Id.*). She took

7

between two and four Vicoprofen a day, which she reported was "working well."
(*Id.*).  She also reported that Baclofen seemed to be helping with "some of the
spasm-like pain."  (*Id.*).

Plaintiff reported that she had been seen by a rheumatologist named Dr.
June.  (*Id.*).  He allegedly told Plaintiff that he felt that she had both Ehlers Danlos
syndrome (EDS) and fibromyalgia possibly related to her insomnia.  (*Id.*).  Dr.
June recommended CBD oil for sleep and recommended that she discontinue
Hydroxyzine "due to its potential blocking of REM sleep."  (*Id.*).  In general, he
indicated that he wanted Plaintiff to discontinue "as many of the pain medications
as possible."  (*Id.*).  Plaintiff then stopped taking Hydroxyzine at Dr. June's
suggestion.  (*Id.*).

At her October 16, 2019 appointment with Dr. Ducommun, Plaintiff
reported that she felt like she had intermittent "allergic type reactions to various
meds that can vary from day to day."  (*Id.*, PageID.389).

On December 9, 2019, Plaintiff complained to Dr. Ducommun of tiredness
and wanted to discuss potential medication changes, specifically eliminating "as
many of her medications as possible."  (*Id.*, PageID.387).  Plaintiff reported
overextending herself doing household chores and experiencing severe fatigue.
(*Id.*).  She was down to four Vicodin a day and rarely took Tramadol.  (*Id.*).
Plaintiff had been treated for dental infections and had been feeling better since

starting antibiotics. (*Id.*). She had stopped taking Vyvanse and was experiencing a "significant decline in her ability to handle mentally challenging activities and fel[t] that the Vyvanse was helping her a lot with respect to focus, concentration, and her ability to participate in family activities." (*Id.*). Dr. Ducommun restarted Plaintiff on Vyvanse. (*Id.*, PageID.388).

## 2.    Rheumatology Record

On August 28, 2019, Plaintiff had an initial consultation with Great Lakes Center of Rheumatology. (*Id.*, PageID.329). Plaintiff's referring diagnosis was chronic pain, and she had previously been diagnosed with fibromyalgia and EDS. (*Id.*). She had not treated her fibromyalgia with either physical or occupational therapy. (*Id.*).

Plaintiff was also diagnosed with a Chiari malformation in 2015, for which a neurosurgeon performed a decompression in 2017. (*Id.*). She indicated that "[h]er pain did not resolve following the surgery." (*Id.*).

On examination, Plaintiff's musculoskeletal system was normal and none of her joints were tender or swollen. (*Id.*, PageID.332). Plaintiff had soft tissue discomfort in 14 out of 18 tender points. (*Id.*). Plaintiff was assessed with polyarthritis, hypermobility syndrome, fibromyalgia (likely due to sleep deprivation), an unspecified sleep disorder, and Chiari type 1 causing compression of the brain that was decompressed in 2017. (*Id.*). A workup for polyarthritis was

ordered and Plaintiff was referred to pulmonologist Oktai Mamedov, M.D. for her fibromyalgia.  (*Id.*).  Plaintiff was instructed to complete bloodwork and a sleep study and return for a follow-up visit in six weeks.  (*Id.*, PageID.333).

### 3.     Medical Opinion

R. Lazzara, M.D. (Dr. Lazzara). completed a physical medical source statement dated November 21, 2021.  (ECF No. 6-1, PageID.577-580).  He listed Plaintiff's diagnoses as degenerative disc disease with syrinx, EDS, and Chiari malformation.  (*Id.*, PageID.577).  Her symptoms included chronic pain, fatigue, and vertigo exacerbated by exertion and stress.  (*Id.*).  Her pain was located in her neck and upper back, and she also experienced sharp spasms.  (*Id.*).  Plaintiff's treatment included injections and physical therapy as needed.  (*Id.*).  Her symptoms and functional limitations were affected by PTSD.  (*Id.*, PageID.578).

Dr. Lazzara estimated that Plaintiff could sit for about four hours during a workday and stand/walk for about four hours during the same.  (*Id.*).  Plaintiff could sit for about an hour before needing to get up and could stand for about thirty minutes before needing to either sit or walk around.  (*Id.*).  She could also walk for about thirty minutes before needing a break.  (*Id.*).  Plaintiff did not need to elevate her legs while sitting nor did she need a hand-held assistive device while standing/walking.  (*Id.*).  Dr. Lazzara estimated that Plaintiff would likely be off task for 15% of a workday, would miss more than four days per month of work,

and was capable of low stress work.  (*Id.*, PageID.580).

III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

11

> Step Five: Even if the claimant is unable to perform his or her past
> relevant work, if other work exists in the national economy that the
> claimant can perform, in view of his or her age, education, and work
> experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D.
Mich. Oct. 31, 2008) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of
Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the
claimant throughout the first four steps. . . . If the analysis reaches the fifth step
without a finding that claimant is not disabled, the burden transfers to the
[Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110
(6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff was
not disabled under the Act. At Step One, the ALJ found that Plaintiff had not
engaged in substantial gainful activity between November 16, 2018 (amended
alleged onset date) and December 31, 2019 (date last insured). (ECF No. 6-1,
PageID.35). At Step Two, the ALJ found that she had the severe impairments of
polyarthritis, depressive disorder, anxiety disorder, and PTSD. (*Id.*). At Step
Three, the ALJ found that none of Plaintiff's impairments met or medically
equaled a listed impairment. (*Id.*, PageID.36).

The ALJ then assessed Plaintiff's residual functional capacity (RFC),
concluding that she was capable of performing

> light work as defined in 20 CFR 404.1567(b) except she can stand/walk
> up to 4 hours in an 8-hour workday. She can occasionally climb
> ramps/stairs, stoop, kneel, crouch or crawl. She is unable to climb
> ladders, ropes, of scaffolds and should have no exposure to unprotected
> heights, dangerous moving machinery, or loud noise above level 3. She
> is limited to simple routine tasks.

(*Id.*, PageID.38).

At Step Four, the ALJ found that Plaintiff was unable to perform any past relevant work. (*Id.*, PageID.45). At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Plaintiff was capable of performing the jobs of stock clerk (70,000 jobs nationally), office clerk (60,000), and shipping clerk (20,000). (*Id.*, PageID.45-46). As a result, the ALJ concluded that Plaintiff was not disabled under the Act. (*Id.*, PageID.46).

## IV.    Standard of Review

A district court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g). Although a court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one. Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision. *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224-225 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506,

13

509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same), *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148 (2019).

An ALJ's factual findings must be supported by "substantial evidence."  42 U.S.C. § 405(g).  The Supreme Court has explained:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo.  *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) (" 'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.' " (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009))).  An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them.  *Biestek*, 139 S. Ct. at 1154.

14

Although the substantial evidence standard is deferential, it is not trivial. The court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal quotation marks and citation omitted).  Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the [Social Security Administration (SSA)] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec*., 582 F.3d 647, 651 (6th Cir. 2009) (internal quotation marks and citations omitted).

## V.    Analysis

Plaintiff argues that the ALJ erred when finding that Plaintiff's fibromyalgia was a non-severe impairment at Step II.  In response, the Commissioner argues that the ALJ's evaluation of Plaintiff's fibromyalgia was supported by substantial evidence.

### A.    Legal Standard

To be found disabled, "the ALJ must find that the claimant has a severe

impairment or impairments" at step two.  *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 88 (6th Cir. 1985).  An impairment will be found severe if the it "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. § 416.920(c).  Basic work activities include:

> (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2)  Capacities for seeing, hearing, and speaking;
>
> (3)  Understanding, carrying out, and remembering simple instructions;
>
> (4)  Use of judgment;
>
> (5)  Responding appropriately to supervision, co-workers and usual work situations; and
>
> (6)  Dealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b).

The step two determination is "a *de minimis* hurdle," in that "an impairment will be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Brown*, 880 F.2d 860, 862 (6th Cir. 1988) (citing *Farris*, 773 F.2d at 90).  Importantly, the diagnosis of an impairment "says nothing about the severity of the condition."  *Id.* at 863.  Rather, the claimant must "produce or point to some evidence that indicates that an alleged impairment impacts his ability to perform basic work activities."  *Johnson v. Astrue*, No. 3:09-CV-317, 2010 WL 2803579, at *5 (E.D.

Tenn. June 30, 2010), *report and recommendation adopted*, 2010 WL 2836137

(E.D. Tenn. July 15, 2010).

B.    Application

Fibromyalgia is often a difficult medical condition for an ALJ to assess.  As

one district court has aptly explained,

> "[f]ibromyalgia, also called fibrositis, 'is a medical condition marked
> by chronic diffuse widespread aching and stiffness of muscles and soft
> tissues.' " *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 860
> (6th Cir. 2011) (quoting Stedman's Medical Dictionary for the Health
> Professions and Nursing at 541 (5th ed. 2005)).   The illness has no
> known cause or cure. *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417,
> 434-35 (6th Cir. 2013).   "[W]hen a claimant has a fibromyalgia
> diagnosis, objective medical evidence of the condition is rare." *Gursky
> v. Colvin*, No. 16-CV-2654-TMP, 2017 WL 6493149, at *9 (W.D.
> Tenn. Dec. 19, 2017).   "Rather, fibromyalgia patients manifest normal
> muscle strength and neurological reactions and have a full range of
> motion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir.
> 2007) (internal citations and quotations omitted).   As a result, evidence
> of the severity of symptoms of fibromyalgia is almost entirely
> subjective.   *Minor*, 513 F. App'x at 434-35.   The severity of
> fibromyalgia symptoms can also vary significantly over time - people
> with fibromyalgia have good days and bad days. *See Gursky*, 2017 WL
> 6493149 at *9.
>
> These unique features of fibromyalgia complicate the Social Security
> disability evaluation process. *See Cooper v. Comm'r of Soc. Sec.*, No.
> 4:13-CV-11883, 2014 WL 4606010, at *15 (E.D. Mich. June 17, 2014),
> report and recommendation adopted, 2014 WL 4607960 (E.D. Mich.
> Sept. 15, 2014).   Usually, examining objective medical evidence is a
> central part of how ALJs evaluate disability claims.   See id.   But
> because people with fibromyalgia usually have normal clinical results,
> objective medical evidence is "simply beside the point." *Kalmbach*,
> 409 F. App'x at 862.   "[A]n ALJ errs when he or she discounts a
> plaintiff's complaints of fibromyalgia symptoms based on a lack of
> objective evidence and/or benign physical exam findings or test

results." *Partlow v. Comm'r of Soc. Sec.*, No. 2:18-CV-1702, 2019 WL 5257541, at \*6 (S.D. Ohio Oct. 17, 2019), <u>report and recommendation adopted</u>, 2020 WL 247336 (S.D. Ohio Jan. 16, 2020). Likewise, an ALJ errs in rejecting a medical opinion about the severity of fibromyalgia because the objective medical evidence is normal. *Kalmbach*, 409 F. App'x at 862. Despite this, "a diagnosis of fibromyalgia does not equate to a finding of disability or an entitlement to benefits." *Stankoski v. Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013). On more than one occasion, the Sixth Circuit has quoted the Seventh Circuit's important observation that while "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working . . . most do not and the question is whether [the claimant in this case] is one of the minority." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); *Minor*, 513 F. App'x at 434-35; *Torres v. Comm'r of Soc. Sec.*, 490 F. App'x 748, 754 (6th Cir. 2012); *Vance v. Comm'r of Soc. Sec.*, 260 [F. App'x] 801, 806 (6th Cir. 2008).

*Taylor v. Saul*, No. 19-1289-TMP, 2020 WL 3889027, at \*3 (W.D. Tenn. July 10, 2020).

Here, the ALJ found that Plaintiff had the severe impairments of polyarthritis, depressive disorder, anxiety disorder, and PTSD. (ECF No. 6-1, PageID.35). In addition to these severe impairments, the ALJ found that Plaintiff's

cognitive disorder, attention-deficit disorder (ADD), fibromyalgia, insomnia, history of Chiari Malformation status-post decompression in 2017, hypermobility syndrome (Ehler[s]-Danlos syndrome (EDS)), and obesity [were] non-severe impairments during the relevant period. The record [did] not reflect that these ailments infringed upon her ability to perform basic work activities, either exertional or non-exertional (20 CFR 404.1522). Without a significant limitation to her ability to perform basic work activities, [Plaintiff's] conditions [were] non-severe impairments. [The ALJ] also considered all of [Plaintiff's] medically determinable impairments, including those that are not severe, when assessing [her] residual functional capacity.

(*Id.*, PageID.36). Specifically, the ALJ noted that Plaintiff "has insomnia related

fibromyalgia, but her rheumatologist found her fibromyalgia was generally

stabilized with treatment." (*Id.* (internal record citation omitted)).  She also noted

that "[i]n September 2019, Ketamine worked well for associated nerve pain and by

December 2019 her fibromyalgia was notably unchanged." (*Id.* (internal record

citation omitted)).

When assessing Plaintiff's RFC, the ALJ explained that

> [t]he records during the period show good symptom management with treatment compliance for mental and physical symptoms.  There is also no indication from a medical provider why she would be bedridden or would need to rest/lie down 16 hours a day or stay in a dark room four days a week as she alleges.  [The ALJ] also considered her daily activities in assessing her residual functional capacity.  Yet she can do some housework, care for her children, drive a car, shop in stores, perform grooming tasks, and make simple meals.  She likes to read, paint, and can use a computer or smartphone.  All these activities require some degree of movement mental function, which points to continued abilities to function at a greater degree than alleged.  As such, [the ALJ found Plaintiff] reasonably limited to a light range of function.  She has pain, fatigue, and noise sensitivity that reasonably warrant a light exertion range, standing/walking 4 of 8 hours in a workday, occasional posturals, no ladders/ropes/scaffolds, no exposure to hazards, and no loud nose above level 3 to avoid aggravation of symptoms and protect against workplace injury.  She has mental and focus issues reasonably warranting the performance of simple routine work tasks.

(*Id.*, PageID.43 (internal record citations omitted)).  Ultimately, as stated above,

the ALJ limited Plaintiff to light work with additional limitations. (*Id.*,

PageID.38).

The bulk of Plaintiff's brief focuses on the ALJ's failure to classify

fibromyalgia as a severe impairment.  For example, she asserts that "[t]he ALJ's significant mischaracterization of the record in describing [Plaintiff's] fibromyalgia as well-managed with medications was fatal to her analysis of the case, as it allowed her to evade the considerations that come with analyzing a fibromyalgia claim."  (ECF No. 12, PageID.605).  Plaintiff particularly faults the ALJ for appearing to focus on objective findings to undermine Plaintiff's fibromyalgia impairment.  For instance, Plaintiff says that by finding fibromyalgia to be a non-severe impairment, the ALJ was able "to author an unfavorable decision predicated on normal musculoskeletal findings and conservative treatment without addressing the relationship of these findings to [Plaintiff's] condition." (*Id.*, PageID.606).  However, as another magistrate judge in this district has explained, "while the subjective symptoms take on greater significance in a fibromyalgia claim," it does not follow that an ALJ erred "in noting that the objective evidence also stood at odds with the claim of disabling fibromyalgia." *Gilbert v. Comm'r of Soc. Sec.*, No. 20-11072, 2021 WL 4785929, at *9 (E.D. Mich. Apr. 30, 2021), *report and recommendation adopted*, 2021 WL 4260677 (E.D. Mich. Sept. 20, 2021).

While it is true that symptoms of fibromyalgia may wax or wane and that the condition is often difficult to assess on physical examination or imaging, Plaintiff points to nothing beyond her own testimony and subjective reports to medical

20

providers in support of her fibromyalgia being a severe impairment.  The only

medical opinion of record is from Dr. Lazzara.  (ECF No. 6-1, PageID.577-580).

He listed Plaintiff's diagnoses as degenerative disc disease with syrinx, EDS, and

Chiari malformation but notably did not list fibromyalgia.  (*Id.*, PageID.577).

Further, Dr. Lazzara did not indicate that Plaintiff was as limited as she claimed to

be at the hearing.  For example, Dr. Lazzara estimated that Plaintiff could sit for

about four hours during a workday and stand/walk for about four hours during the

same.  (*Id.*, PageID.578).  In contrast, Plaintiff testified at the hearing that during a

fibromyalgia flare she spent about "16 hours a day on [her] best days" resting in

bed on her back.  (*Id.*, PageID.66).

Additionally, Plaintiff only had one rheumatology appointment during the

relevant period.  That appointment took place on August 28, 2019, and Plaintiff

was instructed to complete bloodwork and a sleep study and return for a follow-up

visit in six weeks.  (*Id.*, PageID.329-333).  It does not appear that Plaintiff

followed these instructions.  In failing to do so, Plaintiff made it difficult to assess

the severity of her fibromyalgia, particularly because the rheumatology record

suggests that it was caused by sleep deprivation.  (*Id.*, PageID.332).

Plaintiff also argues that the ALJ's mischaracterization of the evidence

affected her RFC assessment.  (ECF No. 12, PageID.612).  However, a claimant is

generally "responsible for providing the evidence . . . use[d] to make a finding

about [her] residual functional capacity." 20 C.F.R. § 416.945(a)(3).  Here, the

ALJ considered Dr. Lazzara's opinion when assessing Plaintiff's RFC.  For

example, the ALJ was "persuaded by the opinion of light range limitations and sit

or stand/walk 4 hours of 8 hours, as it is supported by the findings of Dr. Edmond

Ducommun, M.D. who treated the claimant prior to Dr. Lazzara, and during the

period at issue."  (ECF No. 6-1, PageID.44).  She also found that Dr. Lazzara's

"conclusions that [Plaintiff] was capable of low stress work" to be "internally

inconsistent with [his conclusions regarding] off task time and days missed from

work."  (*Id.*).  As such, she did not credit Dr. Lazzara's opinion as to "off task

time, work absences and sit 4 of 8 hours."  (*Id.*).  Further, Plaintiff has not pointed

to any record evidence in support of her testimony that she is unable to work

because of her fibromyalgia.  *See Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x

393, 400 (6th Cir. 2016) ("Dr. Beals ([the p]laintiff's fibromyalgia specialist) did

not identify any functional restrictions stemming from [the] plaintiff's

fibromyalgia, and [the p]laintiff failed to provide any additional evidence

supporting her statements regarding the debilitating effects of her fibromyalgia.").

Thus, Plaintiff has not met her responsibility under 20 C.F.R. § 416.945(a)(3) to

provide evidence in support of her desired RFC.

Finally, the Sixth Circuit has held that "the fact that some of a claimant's

impairments were not deemed to be severe at step two is legally irrelevant where

22

other impairments are found to be severe." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) (cleaned up).  "An erroneous finding of nonseverity at step two is therefore harmless where the ALJ properly considers nonsevere impairments at later steps." *Id.*  Thus, even if the ALJ erred when she found Plaintiff's fibromyalgia to be non-severe, this error would be harmless because she considered fibromyalgia when crafting the RFC.  *See Horning v. Comm'r of Soc. Sec.*, No. 14–11723, 2015 WL 4771440, at *10 (E.D. Mich. Aug. 14, 2015) (explaining that "any error in the ALJ's treatment of Plaintiff's fibromyalgia at Step 2 was rendered harmless by the ALJ's treatment of Plaintiff's fibromyalgia during the determination of Plaintiff's RFC").

## VI.   Conclusion

For the reasons stated above, the undersigned RECOMMENDS that Plaintiff's motion, (ECF No. 12), be DENIED; the Commissioner's motion, (ECF No. 14), be GRANTED; and the decision of the ALJ be AFFIRMED.

Dated: February 7, 2024             s/Kimberly G. Altman
Detroit, Michigan                   KIMBERLY G. ALTMAN
                                    United States Magistrate Judge


## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 7, 2024.

<u>s/Carolyn Ciesla</u>
CAROLYN CIESLA
Case Manager